Argued and submitted December 5, 1980, affirmed March 9, 1981

DECKER et al,
*Appellants,*

*v.*

BEREAN BAPTIST CHURCH (CONSERVATIVE),
aka Berean Baptist Church of Keizer,
*Respondent.*

(No. 106039, CA 16606)

624 P2d 1094

Brad Littlefield, Portland, argued the cause for appellants. With him on the briefs was Goldsmith, Siegel, Engel & Littlefield, Portland.

Larry J. Molinari, Salem, argued the cause and filed the brief for respondent.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

WARDEN, J.

## WARDEN, J.

Plaintiffs, former members of defendant Berean Baptist Church (Conservative), brought this suit for declaratory judgment and injunctive relief. Seeking to void the allegedly unlawful conversion of the church to an Independent Baptist Church and to gain exclusive control of the church, plaintiffs appeal from the decree in favor of defendants.[1] Assigned as errors are (1) the trial court's application

---

[1] The Decree in Equity states in relevant part:

[The court finds:]

" 1. That from November 1976, until and beyond May 1977, the Church was operated contrary to its Constitution and By-Laws;

" 2. That Mr. Earl Sandner and his 'followers' had no authority to 'suspend' the Constitution of the Church during the above period;

" 3. That the congregation of the Church was entitled to notice of the movement to disaffiliate the Church from the Conservative Baptist Association and that the congregation was entitled to notice of the candidacy of Reverend William McFeters;

" 4. That Reverend McFeters was not elected in accordance with the Constitution of the Church and with the proper use of a pulpit committee;

" 5. That the departure of the Church from Conservatism is more a departure in practice than in doctrine;

" 6. That the Plaintiffs have not actually been denied the right and privilege of attending church and participating in the activities, but that Plaintiffs' withdrawal from the Church was voluntary;

" 7. That at the time of the 'suspension' of the Church Constitution, the congregation had dwindled from 137 to 44, and that had someone not taken the helm, as did Mr. Sandner, the Church would probably have floundered;

" 8. That the rift in the Church actually occurred in November 1976, not in May 1977, when the Constitution was suspended and Reverend McFeters was 'elected';

" 9. That since May 1977, the congregation has grown from 44 to 82, and that the Kindergarten program has developed into a school for grades 1-12 in which some 60 to 80 students attend;

"10. That nearly all the Plaintiffs and former members who testified have since joined other churches which they are now attending;

"11. That none of the individuals involved stand to gain or lose any actual property rights in a decision in this case.

"12. That although the Court certainly does not condone the action of Mr. Sandner and the others who departed from the Constitution and acted on their own, to declare their actions void, thereby reinstating the former members and ousting the present congregation, would be imposing a

of the doctrine of relative hardship[2] to deny the requested relief; and (2) in the alternative, the failure of the trial court to award plaintiffs a money judgment. We review *de novo.*

The Berean Baptist Church (Conservative) in Salem was formed in 1969, and some of the plaintiffs were founding members and helped construct the church building. From the beginning the church was affiliated with the Conservative Baptist Association (CBA). In November, 1976, the membership became divided on the issue whether to retain or discharge the pastor. He then resigned. Approximately half of the total membership of 137 and approximately two-thirds of the named plaintiffs stopped attending at that time.

Throughout the spring of 1977, the surviving church officers unsuccessfully attempted to locate a new pastor through CBA channels. The procedures set forth in the church's constitution were not strictly observed. For example, formal meetings of the pulpit committee were not held. While there were theoretically enough members remaining to fill all the vacated offices, many positions remained unfilled. After June 1, 1977, only seven of the named plaintiffs were still in an active membership status with the right to vote.

On May 22, 1977, a visiting pastor came and preached to the congregation. On May 25, 1977, in a special business meeting, a motion to suspend the constitution for 90 days "and operate under Roberts Rules of Order until that time that we get a new Constitution and By-laws formed * * *" passed unanimously. Notice of the meeting, as required by the constitution, was not given. The new

hardship upon the Defendant and its congregation grossly disproportionate to the injury of Plaintiffs.

"NOW THEREFORE,

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that the relief requested by Plaintiffs is hereby denied, that the suit be dismissed with prejudice, and that neither Plaintiffs nor Defendant shall recover costs and disbursements incurred herein from the other."

[2] *See Tauscher v. Andruss,* 240 Or 304, 308-09, 401 P2d 40 (1965) (removal of encroachment on easement would not cause hardship disproportionate to that suffered by plaintiff).

pastor was elected on June 1, 1977. Although proper notice of the election according to the constitution was not given, members of the congregation who regularly attended services knew about the election and had an opportunity to talk with the candidate and to vote. At that time the total membership numbered 44.

Prior to the election, the new pastor made it clear to church members that he would not accept a position with a church affiliated with the CBA. On June 24, 1977, the church disassociated itself from its CBA affiliation and amended its Articles of Incorporation to remove (1) the word "Conservative" from the name of the religious non-profit corporation and (2) the clause providing that upon liquidation or dissolution of the nonprofit corporation the assets be distributed to the CBA. Several plaintiffs independently involved the Oregon Corporation Commissioner in an attempt to void the amendments for lack of prior written notice; and as a result, the amendments were cancelled in April, 1978. On May 15, 1978, the Articles were again amended, and the record does not show that the validity of that action has ever been challenged.

This lawsuit was filed on May 12, 1978. By that time, all plaintiffs had been properly terminated from membership due to lack of attendance or transfer to other churches. Several plaintiffs were requested to stay, but all plaintiffs found other churches of their choice.

In May, 1978, the membership of the Berean Baptist Church numbered 58. Approximately 65 new members joined the church after June, 1977, under the new pastor. At time of trial in June, 1979, the church membership numbered 82. Under the new pastor, the kindergarten school had developed into a full-scale Sunday School. Two of the new adult members attested to the unity and solidarity of the church membership under the new pastor. Some of the continuing members, like some of the plaintiffs, had helped found the church in 1969. A new constitution consisting of a church covenant, articles of faith and bylaws was adopted on April 4, 1978.

In the Amended Complaint in Equity, plaintiffs requested the following relief:

"WHEREFORE, Plaintiffs pray for a judgment and decree as follows:

"1.  Declaring that the church and its property should be restored to the status quo as of November 10, 1976, when it was operating as a Conservative Baptist Church;

"2.  Declaring that the Plaintiffs are entitled to reinstatement as members of the church, and entitled to occupy and possess the church property and operate and manage the church and its business affairs;

"3.  Restraining Defendant's agents, servants and representatives from occupying and possessing the church property, and from appropriating the church property of the Berean Baptist Church (Conservative) to the use and benefit of an independent Baptist Church, and restraining Defendant's agent, servants and representatives from interfering with the Plaintiffs' management, control and possession of the church;

"4.  Declaring that all actions taken by the church since November, 1976 were contrary to the constitution, invalid and unlawful;

"5.  Nullifying the Articles of Amendment filed with the Oregon Corporation Commissioner's Office by Defendant's agents, servants and representatives;

"6.  For such other and further relief as may be just and equitable;

"7.  For Plaintiff's costs and disbursements incurred herein."

Plaintiffs cite, and have evidently modeled their suit upon, *Hughes v. Grossman,* 166 Kan 325, 201 P2d 670 (1949). In that case, two doctrinal factions in a Baptist church divided over the issue of conventionism, one faction (defendants) resorting to locking the other (plaintiffs) out of the church premises. The Kansas Supreme Court directed the trial court to enjoin defendants

"from occupying or possessing the property, buildings and appurtenances of such church and from interfering with the plaintiffs in the managment, control, possession or custody of the church, its property or its business affairs." 166 Kan at 333.

The court found that church identity continued in, and the church property belonged to, the faction abiding by the original "doctrine, tenets, customs and traditions" of the church prior to any schism. *Accord, Philomath College v. Wyatt,* 27 Or 390, 463-67, 31 P 206, 37 P 1022 (1894)

(identity of church determined by reference to confession of faith, fundamental doctrines and law, book of discipline, and usages and customs prior to the division of the church).

■    Civil courts can no longer inquire into questions of church doctrine. In *Presbyterian Church v. Hill Church,* 393 US 440, 449, 89 S Ct 601, 21 L Ed 2d 658 (1969), the United States Supreme Court stated:

> "Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, Abington School Dist. v Schampp, 374 US 203, 10 L ED 2d 844, 83 S Ct 1560 (1963); *the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions. "*(Emphasis added)

■    Although counsel for plaintiffs insisted in oral argument that church doctrine is not at issue in this case, it is plain that plaintiffs' prayer for exclusive control of the church is indeed founded on the principles of doctrinal precedence and identity encountered in *Hughes v. Grossman, supra,* and *Philomath College v. Wyatt, supra.* Plaintiffs have asserted no other basis for the claim to exclusive control or restoration of the *status quo* of November, 1976. Similarly, the claim that an ouster of plaintiffs occurred

because *doctrinal* differences compelled them to leave the church is not cognizable. We find, as did the trial court, *supra,* n 1, that plaintiffs' withdrawal from the church was purely voluntary.

When issues of doctrine are properly removed from this case, plaintiffs are left with a cause of action for invalidation of certain corporate acts as having been made without compliance with the existing constitution. The important acts complained of are the suspension of the constitution on May 25, 1977, the election of the new pastor on June 1, 1977, the disaffiliation from the CBA on June 24, 1977, and the amendment of the Articles of Incorporation on June 24, 1977. With respect to the last, that act has already been invalidated by the Corporation Commissioner. Plaintiffs do not assert that the second amendment of the Articles on May 15, 1978, violated the constitution. We therefore focus only upon the three specified actions in May and June of 1977.

Plaintiffs cite *Banks v. Community Church,* 178 Or 1, 22-23, 165 P2d 65 (1946), as authority for the invalidation of an act of a church organization for failure to follow its own bylaws. In *Banks,* a deed was declared void because the election of the purported trustee-grantors and the meeting authorizing the conveyance of church property to defendant were not preceded by notice to all members, contrary to established usages having the effect of bylaws. Plaintiffs in *Banks,* however, were current trustees of the religious society, and the invalidation of the deed removed a cloud from the title to the church property.

Assuming without deciding that the acts in question were not validly made, were this court to invalidate the suspension of the constitution, the election of the new pastor, and the disaffiliation from the CBA, no purpose would now be served by such a decree, unlike the situation in *Banks.* Plaintiffs here all left the church voluntarily, and they allege no basis on which reinstatement would be proper. There was, for example, no showing that the terminations were unlawful or contrary to established procedures. Inasmuch as they are no longer members of the church, plaintiffs have no current interest in the internal

workings of the church corporation.[3] The corporation can ratify any past actions that may have been deficient in procedure. As to the request for a money judgment, plaintiffs did not include that demand in their amended prayer, nor have they demonstrated any individual interest in the church property. *Cf. Berean Fundamental Church Council v. Braun,* 281 Or 661, 576 P2d 361 (1978) (real property of church held in trust by national ruling body for benefit of pastor, local council and congregation). Equity always regards substance rather than form. *General Elec. Co. v. Wahle,* 207 Or 302, 317, 296 P2d 635 (1956). Under all the circumstances of this case, we conclude that plaintiffs are not entitled to any relief. The result of the trial court was correct.

Affirmed.

---

[3] Because the standing of plaintiffs to bring suit was not raised by defendants' pleadings, that issue has been waived. *Dickman et al v. School Dist.,* 232 Or 238, 245, 366 P2d 533, *cert den* 371 US 823, 83 S Ct 41, 9 L ED 2d 62 (1962). However, plaintiffs no longer have standing within the church corporation, and that lack of standing is a relevant consideration in determining the equities.