Argued and submitted June 11, 1999, reversed and remanded January 5, 2000

## OCHOCO LUMBER COMPANY,
### a limited partnership,
*Appellant,*

*v.*

## FIBREX & SHIPPING COMPANY, INC.;
### Akira Saheki and Saeko Saheki,
### husband and wife;
### and United States National Bank,
*Respondents,*

*and*

## CLEARWATER MANAGEMENT COMPANY, INC.,
*Defendants.*

(9611-08595; CA A100466)

994 P2d 793

Roger A. Lenneberg argued the cause for appellant. With him on the briefs was Grant & Lenneberg.

Mary E. Farr argued the cause for respondents. With her on the brief were Thomas J. Matsuda and Kell, Alterman & Runstein.

Before Wollheim, Presiding Judge, and Deits, Chief Judge,* and Kistler, Judge.

KISTLER, J.

---

* Deits, C. J., *vice* Warren, S. J.

## KISTLER, J.

The trial court ruled that neither the applicant nor the issuer on a standby letter of credit can be subrogated to the beneficiary's claims. The court accordingly granted defendants' motion to dismiss plaintiff's equitable subrogation claims, denied plaintiff leave to replead, and entered judgment on those claims. We reverse and remand.

In 1993, defendant Fibrex & Shipping Co., Inc., entered into an agreement to purchase timber in Montana. To fund the purchase, Fibrex borrowed $3,900,000 from West One Idaho Bank.[1] West One imposed two conditions on the loan. First, it required that Fibrex's sole shareholder, Akira Saheki, and his wife, Saeko Saheki, personally guarantee the loan. Second, "[a]s security for repayment of [Fibrex's] note," West One required a standby letter of credit "in an amount no less than the amount of the principal balance of th[e] note."

Fibrex obtained the letter of credit by entering into an agreement with plaintiff Ochoco Lumber Company. Fibrex agreed to sell and Ochoco agreed to buy up to six and one-half million board feet of harvested ponderosa pine logs. As part of their agreement, Ochoco provided for an irrevocable standby letter of credit for $3,900,000, which First Interstate Bank issued for the benefit of West One. The letter of credit both served as security for Ochoco's performance under its agreement with Fibrex and also "was used by Fibrex to fulfill its obligations under [its loan from West One]."[2]

In 1994 and 1995, Fibrex failed to fulfill its obligations under its agreement with Ochoco. In May 1995, Ochoco and Fibrex renegotiated their agreement. In August 1995, Fibrex, Ochoco, and the persons who owned the timber entered into an amended timber purchase agreement. In September 1996, Fibrex's loan from West One came due. Fibrex failed to pay the loan, and West One drew over $2 million on First Interstate's letter of credit. Ochoco reimbursed

---

[1] West One Idaho Bank has since been acquired by US Bank.

[2] Fibrex agreed to use the funds it received from Ochoco's log purchases to reduce the balance on its loan with West One and thus reduce Ochoco's exposure on the letter of credit.

First Interstate Bank in full.[3] Ochoco then demanded repayment from Fibrex. After Fibrex refused to repay Ochoco, Ochoco notified West One that it was subrogated to West One's rights against both Fibrex and the Sahekis, the guarantors of Fibrex's loan.

When West One refused to acknowledge Ochoco's equitable subrogation rights, Ochoco brought an action alleging, among other things, four claims for relief that were based on equitable subrogation. Ochoco sought a declaration that it is subrogated to West One's rights, it sued Fibrex on the note that Fibrex had given West One, and it sued the Sahekis on their guarantee. Ochoco also sought injunctive relief against Fibrex and the Sahekis.[4] Defendants moved to dismiss Ochoco's claims for relief that were based on equitable subrogation. Relying on *Tudor Dev. Group, Inc. v. U.S. Fid. & Guar. Co.*, 968 F2d 357 (3d Cir 1992), and *Shokai v. U. S. National Bank of Oregon*, 126 F3d 1135 (9th Cir 1997), defendants argued that equitable subrogation is not available to the parties on a standby letter of credit. The trial court agreed. It dismissed Ochoco's subrogation claims without leave to replead and entered judgment on those claims pursuant to ORCP 67 B.

On appeal, defendants advance two arguments. They argue initially that equitable subrogation is available only to persons who are secondarily liable for a debt. They reason that the issuer's contractual obligation to pay on a standby letter of credit[5] means that the issuer is primarily, not secondarily, liable. They argue alternatively that, in any event,

---

[3] The complaint does not allege specifically that Ochoco reimbursed First Interstate. Ochoco acknowledged that oversight at the Rule 21 hearing and stated that it would replead to include that allegation. The trial court, however, dismissed Ochoco's subrogation claims without leave to replead, thereby preventing Ochoco from alleging that it had reimbursed First Interstate pursuant to its obligations under the letter of credit. Fibrex neither objected to Ochoco's request to replead at the Rule 21 hearing nor disputes Ochoco's contention on appeal that it reimbursed First Interstate in full. We accordingly assume that Ochoco has paid First Interstate the amount it paid West One.

[4] Ochoco alleged other claims for relief, but only its first, second, and third claims for relief and the first count of its thirteenth claim for relief are based on equitable subrogation and are at issue here.

[5] A letter of credit "is an engagement by an issuer, usually a bank, made at the request of the [applicant] for a fee, to honor a beneficiary's drafts or other demands for payment upon satisfaction of the conditions set forth in the letter of credit." *Tudor Dev. Group, Inc.*, 968 F2d at 360; *accord* Peter R. Jarvis, *Standby Letters of*

the particular facts of this transaction make subrogation inappropriate. Ochoco responds that a standby letter of credit is no different from a surety bond or a guarantee in that the issuer's obligation to pay on a standby letter of credit does not arise until there is a default. It follows, Ochoco reasons, that equitable subrogation should be equally available to the parties to a standby letter of credit; the transactions are in substance no different.

We begin with the statutes that govern letters of credit. When First Interstate issued the letter of credit in this case, the Oregon statutes did not address whether equitable subrogation was available on a standby letter of credit. Nothing should be inferred from that omission, however. ORS 75.1020(3) (1991) specifically recognized that "ORS 75.1010 to 75.1170 deal with some but not all the rules and concepts of letters of credit as such rules or concepts have developed * * * or may hereafter develop." It added: "The fact that ORS 75.1010 to 75.1170 state a rule does not by itself require, imply or negate application of the same or a converse rule to a situation not provided for * * * by ORS 75.1010 to 75.1170." ORS 75.1020(3) (1991). The statute thus explicitly left to judicial development those rules that were not codified in ORS chapter 75.

In 1997, the legislature authorized issuers of and applicants for letters of credit to seek equitable subrogation but made the new statute applicable to letters of credit issued on or after January 1, 1998.[6] Or Laws 1997, ch 150, §§ 20, 27

_Credit—Issuers' Subrogation and Assignment Rights_, 9 UCC LJ 356, 356-60 (1977). There are two major types of letters of credit transactions. A commercial letter of credit is typically used when the seller is unfamiliar or uncertain about the buyer's credit history. _Id._ The beneficiary of a commercial letter of credit (usually the seller) may draw upon the letter by showing that it has performed and is entitled to the funds. _Id._ A standby letter of credit, on the other hand, typically requires the production of documents showing that the applicant has defaulted on its obligation to the beneficiary, which triggers the beneficiary's right to draw on the letter. _Id._

[6] Oregon Laws 1997, chapter 150, section 20, provided, in part:

"(1) An issuer that honors a beneficiary's presentation is subrogated to the rights of the beneficiary to the same extent as if the issuer were a secondary obligor of the underlying obligation owed to the beneficiary and of the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant.

"(2) An applicant that reimburses an issuer is subrogated to the rights of the issuer against any beneficiary, presenter or nominated person to the same

& 29. The Ninth Circuit has concluded that because Oregon's 1997 law applies prospectively, the Oregon Legislature must have believed that prior law did not allow subrogation. *See Shokai*, 126 F3d at 1136. Defendants find the Ninth Circuit's reasoning "instructive" and urge us to follow it. We decline to do so.

■  The 1997 Legislature amended many of the provisions in ORS chapter 75 governing letters of credit. *See* Or Laws 1997, ch 150, §§ 3-20. The fact that the legislature provided that all those amendments would apply prospectively hardly reflects a judgment on the existing state of the law with respect to each or any of them. *See* Or Laws 1997, ch 150, § 27. The inference the Ninth Circuit drew is, at best, a weak one and is at odds with the long-standing principle that one legislature's view on an earlier state of the law is entitled to little or no weight. *Cf. DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d 1316 (1984) ("[t]he views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors"). Even if, however, the inference that defendants urge were textually permissible, it is not required and the legislative history points in the opposite direction. The Oregon Bankers' Association, which sponsored the 1997 legislation, told the legislature that the courts had not agreed on the availability of equitable subrogation, giving rise to confusion in the law. Testimony, Senate Committee on Business, Law and Government, SB 246, January 22, 1997, Ex H (statement of Frank E. Brawner). Although the legislature sought to clarify the law for letters of credit issued after the effective date of the act, the text, context, and the legislative history of the 1997 act do not suggest that the legislature made any judgment about the parties' right to equitable subrogation for letters of credit issued before the act's effective date. We are

---

extent as if the applicant were the secondary obligor of the obligations owed to the issuer and has the rights of subrogation of the issuer to the rights of the beneficiary stated in subsection (1) of this section."

By its terms, that law applies only to letters of credit issued on or after January 1, 1998. Or Laws 1997, ch 150, §§ 27, 29.

accordingly left to resolve that issue under common-law principles.

■ The court has explained that subrogation is " 'the substitution of another person in place of the creditor to whose rights he succeeds in relation to the debt, and gives to the substitute all of the rights, priorities, remedies, liens and securities of the party for whom he is substituted.' " *Maine Bonding v. Centennial Ins. Co.*, 298 Or 514, 521, 693 P2d 1296 (1985) (quoting *United States F. & G. Co. v. Bramwell*, 108 Or 261, 277, 217 P 332 (1923)). The purpose of subrogation is to prevent unjust enrichment. *See Barnes v. Eastern & Western Lbr. Co.*, 205 Or 553, 596, 287 P2d 929 (1955). Simply stated, subrogation is an equitable device used " 'to compel ultimate discharge of a debt by [the person] who in equity and good conscience ought to pay it * * *.' " *Maine Bonding*, 298 Or at 521 (quoting *United States F. & G. Co.*, 108 Or at 277).

■■ As a general rule, the courts have required that the party seeking subrogation must have paid a debt for which it was secondarily liable. *Wasco Co. v. New England E. Ins. Co.*, 88 Or 465, 469-71, 172 P 126 (1918); *accord Tudor Dev. Group, Inc.*, 968 F2d at 361. The party must not have acted as a volunteer but must have paid to protect its own interests. *Id.* Finally, equitable subrogation "will not be enforced where it will work injustice to those having equal equities." *Id.* The Oregon courts have not specifically addressed how these requirements apply to standby letters of credit.[7] A handful of courts and commentators have done so, although their decisions have not been uniform. *See Tudor Dev. Group, Inc.*, 968 F2d at 361-62 (collecting cases).

The majority and minority views are perhaps best illustrated by the two opinions in *Tudor Dev. Group, Inc.* The majority in *Tudor* focused on whether the issuer is primarily or secondarily liable for the debt. 968 F2d at 362. It reasoned, as a majority of courts have, that the issuer is primarily liable

_____

[7] In *Marshall-Wells Co. v. Tenney*, 118 Or 373, 244 P 84 (1926), the court used the terms letter of credit and guarantee interchangeably, but its reasoning reveals that it was considering the parties' rights under a guarantee, not a letter of credit. *See* Jarvis, 9 UCC LJ at 375.

because a letter of credit imposes an independent obligation on the issuer to pay. *Id.* The majority reasoned that the issuer is "satisfying its own absolute and primary obligation to make payment rather than satisfying an obligation of its customer." *Id.* The majority recognized that the issuer's obligation on a standby letter of credit is secondary in the sense that it does not arise until the applicant has defaulted, but it still declined to view an issuer as comparable to a guarantor.

The dissent in *Tudor* responded that the majority's reasoning proved too much. A surety also has a contractual obligation to pay, but that fact neither means that the surety is primarily liable nor prevents it from seeking equitable subrogation. In the dissent's view, the fact that there is a contractual obligation to pay provides no basis for saying that the issuer of a standby letter of credit is not secondarily liable. Rather, like a surety or guarantor, the issuer of a standby letter of credit only has an obligation to pay if and when there is a default. In this case, for example, the note between West One and Fibrex required Fibrex to obtain a letter of credit as "security for repayment of [Fibrex's] note."

■ ■ The relevant question, in the dissent's view, was whether allowing equitable subrogation would defeat the independence principle that distinguishes letters of credit from guarantees and suretyships. Guarantors generally may assert defenses available to the party whose obligation is guaranteed. *Tudor Dev. Group, Inc.*, 968 F2d at 366. Under the independence principle, however, the issuer of a standby letter of credit may not assert those defenses. Rather, it must pay if the documents presented by the beneficiary satisfy the conditions set out in the letter of credit. *Id.*

In the dissent's view, once the issuer has honored the letter of credit, the purpose of the independence principle—ensuring prompt payment on the letter of credit according to its terms—has been satisfied. *Id.* at 368. The dissent reasoned that denying equitable subrogation after the issuer had paid the letter of credit would not advance the purposes of the one principle that distinguishes letters of credit from guarantees. *Id.* Rather, in the dissent's view, denying subrogation after payment amounts to "[i]nsistence on * * * pointless formalism." *Id.* Although the dissent's view has only

gained minority support among the courts, it has been generally supported by the commentators. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 26-15 (4th ed 1995); Peter R. Jarvis, *Standby Letters of Credit, Issuers' Subrogation and Assignment Rights*, 10 UCC LJ 38 (1977); *cf.* Task Force on the Study of U.C.C. Article 5, *An Examination of U.C.C. Article 5 (Letters of Credit)* 21 (Sept 29, 1989), *reprinted in* 45 Bus L 1527 (1990).

Faced with these two positions, we conclude that the minority view is more persuasive. It recognizes that First Interstate was a *de facto* surety for Fibrex's obligations and is thus consistent with the long-standing principle in Oregon law that equity looks to the substance of the transaction rather than its form. *General Electric Co. v. Wahle*, 207 Or 302, 317, 296 P2d 635 (1956); *Decker v. Berean Baptist Church*, 51 Or App 191, 199, 624 P2d 1094 (1981).[8] It is also consistent with the general practice on standby letters of credit—that the issuer's obligation to pay on the letter of credit only arises if there is a default. *See* Jarvis, 9 UCC LJ at 368-71 (comparing standby letters of credit and guarantees). More importantly, it is consistent with our legislature's recognition that having paid the beneficiary, the issuer (and the applicant if it has reimbursed the issuer) should be able to step into the beneficiary's shoes and assert its rights. Accordingly, we hold that equitable subrogation is available to both the issuer and the applicant on a standby letter of credit.

Defendants advance a second argument. As we understand it, they contend that even if there is no absolute bar to subrogation, the transactions that the parties entered into after First Interstate issued the letter of credit make subrogation inequitable in this case. This case, however, arises on defendants' Rule 21 motion. The parties have not had the opportunity to develop a complete record that would

---

[8] Defendants argue that the court's reasoning in *Newell v. Taylor*, 212 Or 522, 532-33, 321 P2d 294 (1958), supports a contrary position, but the court's reasoning in that case cannot be divorced from the statutory rights established by the workers' compensation laws. As the court explained, the Workers' Compensation Commission had a statutory obligation to pay the injured worker, regardless of whether the injury was due to a third party's negligence. *Id.* at 532. This case is far closer to the court's later decision in *Jenks Hatchery v. Elliott*, 252 Or 25, 30-31, 446 P2d 116 (1968), where the court held, under common-law principles, that an accommodation maker that had paid on a note could sue on it.

allow either the trial court or this court to weigh the equities. Indeed, at oral argument both parties claimed that there were factual issues not apparent on this record that would bear on that determination. In these circumstances, we decline to reach defendants' second argument. Rather, we remand the case for proceedings consistent with this decision.

Reversed and remanded.