# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CRM COLLATERAL II, INC., a
Colorado corporation,
    *Plaintiff-Intervenor-Appellee,*

        and

RICHARD ALTORFER; MARK
GUETZKO; LISA GUETZKO; SEEDORFF
MASONRY, INC.; DALE KARTMAN;
SUSAN KARTMAN; SEEDORFF
PARTNERSHIP, L.P.,
                  *Plaintiffs,*

        v.

TRICOUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON, an Oregon municipal
corporation,
    *Defendant-Intervenor-Appellant,*

        and

KEYBANK NATIONAL ASSOCIATION,
              *Defendant.*

No. 10-36090

D.C. Nos.
3:08-cv-01266-PK
3:09-cv-01135-PK

OPINION

Appeal from the United States District Court
for the District of Oregon
Paul J. Papak, Magistrate Judge, Presiding

Argued and Submitted
December 5, 2011—Seattle, Washington

Filed January 20, 2012

Before: A. Wallace Tashima, M. Margaret McKeown, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

**COUNSEL**

Joel A. Mullin, Esq., Stoel Rives LLP (argued); Timothy Snider, Esq., Leonard J. Feldman, Esq., Stoel Rives LLP, for defendant-intervenor-appellant Tri-County Metropolitan Transportation district of Oregon.

Timothy S. DeJong, Esq., Stoll Stoll Berne Lokting & Shlachter P.C. (argued); Keith A. Ketterling, Esq., Jacob S. Gill, Esq., Stoll Stoll Berne Lokting & Shlachter P.C., for plaintiff-intervenor-appellee CRM Collateral II, Inc.

**OPINION**

TALLMAN, Circuit Judge:

Appellant Tri-County Metropolitan Transportation District of Oregon ("TriMet") provides bus, light rail, and commuter rail service in the Portland metropolitan area. TriMet contracted with Colorado Railcar Manufacturing, LLC ("Colorado Railcar") for the manufacture of light railcars. The

contract ("Railcar Contract") required Colorado Railcar to secure a $3 million standby letter of credit, which Colorado Railcar arranged through CRM Collateral II, Inc. ("Collateral II"), a bankruptcy remote entity.[1] TriMet certified Collateral II's default and drew on the Letter of Credit when Colorado Railcar defaulted. We consider whether Collateral II was a surety to Colorado Railcar, entitled to the defense of discharge. We hold that it was not.

Because the standby letter of credit issued by KeyBank National Association ("KeyBank") required TriMet to certify Collateral II's default, TriMet sought clarification that should Colorado Railcar default, TriMet's authority to certify Collateral II's default would be triggered. In response to TriMet's concern, Collateral II agreed to become a part of the Railcar Contract via Modification No. 1, but it undertook no new obligation nor did it subject itself to any additional liability beyond what it previously undertook by securing the Letter of Credit at Colorado Railcar's direction. Thus, no suretyship was created. Because Collateral II is not entitled to the protections of a surety, it was error for the district court to grant summary judgment in its favor. We reverse and remand.

# I

In November 2005, TriMet entered into the Railcar Contract with Colorado Railcar to build and deliver three light railcars and one trailer for TriMet's use in connection with its new Westside Express Service between Beaverton and Wilsonville, Oregon. The final price for the railcars and trailer was $17,299,135. The Contract required Colorado Railcar to maintain an irrevocable standby letter of credit in the amount of $3 million from the time Colorado Railcar issued notifica-

---

[1] A bankruptcy remote entity is a type of single purpose entity formed with the intent that it be "walled off" from its corporate parent or sibling, such that if the parent files for bankruptcy, the remote entity is unaffected. *See* Steven Seidenberg, *The Pain Spreads*, 96 A.B.A. J. 53, 53 (Jan. 2010).

tion that manufacture would begin to the final delivery of the railcars and trailer to TriMet. The parties had considered other methods of securing the contract, such as a performance bond. But, due to Colorado Railcar's credit history and financial health, TriMet agreed that a letter of credit would be an attainable and less expensive form of security.

Collateral II was formed, in part, for the purpose of fulfilling Colorado Railcar's letter of credit obligation under the contract. Thomas Rader, CEO of Colorado Railcar, was named one of Collateral II's corporate directors along with Scott State, who was also Collateral II's sole corporate officer, serving as both President and Treasurer. John Thompson, Colorado Railcar's CFO, was Collateral II's registered agent at the time of incorporation.

Colorado Railcar, Collateral II, and certain investors entered into an Investment Agreement whereby Colorado Railcar provided quarterly interest payments to the investors for pledging collateral as security for the purchase of a letter of credit in satisfaction of Colorado Railcar's obligation to provide the standby letter of credit. As a result, Collateral II purchased Irrevocable Standby Letter of Credit No. 312084 ("Letter of Credit") from KeyBank for the benefit of TriMet. The Letter of Credit provided that $3 million was available to TriMet upon its presentation of a sight draft accompanied by a signed and dated document "stating the amount requested and containing a statement that reads as follows: 'The undersigned Officer or Director of TriMet hereby certifies that the Applicant is in default under Contract . . . .' " The Letter of Credit was initially set to expire on November 15, 2007.

TriMet first learned that Collateral II, and not Colorado Railcar, was the applicant on the Letter of Credit several months after arrangements were finalized with KeyBank. TriMet initially requested that Collateral II and Colorado Railcar obtain a new corrected Letter of Credit, but they refused to do so. As an alternative solution, TriMet, Colorado Railcar, and

Collateral II agreed to a written modification of the Railcar Contract ("Modification No. 1"), under which Collateral II became a party to the Railcar Contract for the sole purpose of equating a default by Colorado Railcar under the Railcar Contract to a default by Collateral II for purposes of drawing on the Letter of Credit. The modification was clear that Collateral II had no rights under the Railcar Contract, nor did it undertake any new obligations.

In January 2008, TriMet and Colorado Railcar entered into a separate Project Monitoring Agreement ("PMA"), which modified their rights and obligations under the Railcar Contract in an effort to address Colorado Railcar's continuing financial problems. TriMet feared that Colorado Railcar's financial woes would jeopardize its ability to complete the light railcars. After evaluating the feasibility of engaging substitute contractors, TriMet determined that it would be less costly and would reduce delay to financially support Colorado Railcar to the extent needed to ensure completion of the railcars. Thus, under the PMA, TriMet was to make "special contract payments" to or on behalf of Colorado Railcar, including payments not previously provided for under the Railcar Contract. Under the PMA, TriMet was authorized to draw on the Letter of Credit to fund these payments or to compensate itself for any special payments that Colorado Railcar failed to repay. Additionally, the PMA appointed a financial monitor to oversee Colorado Railcar's operations and TriMet was given authority to approve or disapprove Colorado Railcar's budgets and expenditures. Lastly, Colorado Railcar acknowledged in the PMA that it had defaulted under the Railcar Contract and expressly agreed that it would further be in default if it was unable to repay the special contract payments.

Colorado Railcar and TriMet did not inform Collateral II of these negotiations nor obtain its consent to the PMA. The PMA was amended in February 2008, primarily to add Alaska Railroad Corporation as an additional party.[2] Collateral II was

---

[2]Alaska Railroad Corporation had also contracted with Colorado Railcar for the manufacture of railcars, completion of which was similarly in jeopardy given the deteriorating financial condition of Colorado Railcar.

not a party to this amendment, nor was the amended PMA disclosed directly to Collateral II.

Without knowledge of the PMA or amended PMA, Mr. State—on behalf of Collateral II—agreed to an extension of the Letter of Credit to November 15, 2008. State reviewed the amended PMA in June 2008. He did not contact TriMet to discuss the PMA or Collateral II's obligations at that time, but later contacted KeyBank to urge it not to honor any draw as he believed any certification by TriMet to draw on the Letter of Credit would be fraudulent.

Between the date of the amended PMA and the completed manufacture of the railcars and trailer in October 2008, Tri-Met advanced more than $5.5 million in special contract payments to Colorado Railcar. On October 22, 2008, TriMet attempted to draw on the Letter of Credit to reimburse itself for $3 million of those special contract payments. In response, Collateral II filed an action against TriMet and KeyBank in the District of Oregon (the "lead action"). Collateral II alleged TriMet had fraudulently secured Collateral II's consent to the extension of the Letter of Credit, sought to enjoin KeyBank from honoring the draw, asked for a declaration that the Letter of Credit was unenforceable, and requested rescission of the amendments to the Letter of Credit. Subsequently, Collateral II voluntarily dismissed KeyBank from the action. TriMet filed a counterclaim in the lead action, requesting a declaration that the Letter of Credit was valid and enforceable, that TriMet's draw request was enforceable, that Collateral II was in default on the underlying contract, and that TriMet was entitled to draw $3 million on the Letter of Credit.

Contemporaneously, a group of Collateral II investors filed a motion to enjoin KeyBank from honoring the letter of credit in the state court for Clayton County, Iowa (the "member action").[3] KeyBank did not oppose the motion and a tempo-

---

[3]Per the Investment Agreement, the individual investors' assets secured Collateral II's obligation to reimburse KeyBank for any TriMet draw on the Letter of Credit and those assets were to be foreclosed upon if Collateral II failed to reimburse KeyBank.

rary injunction was granted on November 7, 2008, enjoining KeyBank from honoring any draw request by TriMet. Key-Bank removed the member action to the United States District Court for the Northern District of Iowa on the basis of diversity. TriMet intervened and filed a motion to dissolve the injunction. Collateral II also intervened. The member action was transferred to the District of Oregon and consolidated with the lead action presided over by United States Magistrate Judge Paul Papak.

That court granted TriMet's renewed motion to dissolve the temporary injunction enjoining KeyBank from honoring Tri-Met's draw requests. TriMet then successfully drew on the Letter of Credit in the amount of $3 million on December 1, 2009.

In the proceedings that followed, the district court held that Modification No. 1 created a suretyship between the parties whereby Collateral II became secondarily liable for Colorado Railcar's obligations under the Railcar Contract. Given Collateral II's status as a surety, the court concluded as a matter of law that the surety defense of discharge was available because the PMA had materially increased the risk Collateral II faced as a surety without Collateral II's consent. On these grounds the court granted summary judgment in Collateral II's favor on TriMet's counterclaim for a declaration that Collateral II was in default on the Railcar Contract.

Meanwhile, KeyBank had filed a counterclaim against Collateral II in the member action, seeking reimbursement for the funds it paid to TriMet. The plaintiffs in the member action settled with KeyBank, agreeing that Collateral II was liable for the payment on the Letter of Credit.

In a later order, the district court granted summary judgment in favor of Collateral II on the narrow question of Tri-Met's liability for breach of statutory warranty for certifying Collateral II's default in the member action, leaving open the

question of damages in connection with that claim. Subsequently, the court entered a consent judgment against Collateral II on KeyBank's counterclaim against it in the member action. Collateral II paid $3,180,082.50 to KeyBank in satisfaction of the judgment and then amended its pleading in the member action to re-file its cross-claims against TriMet for unjust enrichment, money had and received, and breach of contract.

In its final order in this matter, the district court determined there was no question of fact as to Collateral II's damages or as to whether the damages were a consequence of TriMet's breach of its statutory warranty because TriMet did not offer evidence to dispute that Collateral II incurred damages when it tendered payment to KeyBank for reimbursement of the draw on the Letter of Credit. The court awarded Collateral II $3,180,082.50 plus prejudgment interest and denied the remainder of both Collateral II and TriMet's cross-motions for summary judgment as moot.

TriMet appeals, asserting that its draw did not violate the statutory warranty of Oregon Revised Statute § 75.1100(b)(1) (2009); the district court erred in concluding that Collateral II was a surety to the Railcar Contract; and alternatively, even assuming that Collateral II was a surety, genuine issues of material fact exist that preclude summary judgment in Collateral II's favor.

## II

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a district court's ruling on cross-motions for summary judgment. *Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011). We view the evidence in the light most favorable to the nonmoving party and determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (citation and internal quotation marks omit-

ted). When the district court disposes of a case on cross-motions for summary judgment, we may review both the grant of the prevailing party's motion and the corresponding denial of the opponent's motion. *Id.*; *see Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 694 n.2 (9th Cir. 1992).

## A

TriMet contends that Collateral II should not have been characterized as a surety, and thus was not entitled to the surety defense of discharge. Review of the law of letters of credit and the structure of letter of credit transactions is necessary for proper evaluation of the parties' relationships.

**[1]** Oregon Revised Statute § 75.1020 (2009) defines "letter of credit" as a "definite undertaking . . . by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value." An applicant is the "person at whose request or for whose account the letter of credit is issued[,]" sometimes also referred to as the customer. *Id.* The issuer is the bank or other party that issues the letter of credit. *Id.* The beneficiary is the party entitled to payment on the letter of credit upon proper presentation of documents. *Id.* In our case, Collateral II is the applicant, KeyBank the issuer, and TriMet the beneficiary.

**[2]** At issue here is a standby letter of credit. Unlike a traditional commercial letter of credit, which is commonly used in commercial sales to reduce the risk of nonpayment for goods, standby letters of credit are used in the non-sale setting and serve to reduce the risk of nonperformance under a performance contract. John F. Dolan, The Law of Letters of Credit ¶ 1.04 (4th ed. 2007). To draw on the letter, the beneficiary is typically required to produce documents certifying the applicant has defaulted on its underlying obligation to the

beneficiary. *Ochoco Lumber Co. v. Fibrex & Shipping Co.*, 994 P.2d 793, 795 n.5 (Or. Ct. App. 2000). The letter of credit transaction typically involves two contracts and the letter of credit. First, there is the underlying contract for services or goods between the applicant and beneficiary. Second, there is a reimbursement contract between the applicant and issuer, requiring the applicant to reimburse the issuer for any payments made on the letter of credit. Lastly, there is the issuer's obligation under the letter of credit itself.

Unlike the typical letter of credit transaction, in this transaction there was no underlying contract for goods or services between Collateral II and TriMet. Instead the performance contract was between Colorado Railcar and TriMet. Because Colorado Railcar fulfilled its obligation to secure a letter of credit by employing Collateral II as applicant, Collateral II and TriMet did not initially contract with each other. Instead, each separately contracted with a third-party: Colorado Railcar. This fourth relationship is the basis for Collateral II's claim that it should be characterized as a surety.

**[3]** We first note that a standby letter of credit itself does not create a suretyship. A standby letter of credit functions somewhat like a guaranty, given that it is the applicant's default that triggers the beneficiary's ability to draw on the letter of credit. James J. White & Robert S. Summers, Uniform Commercial Code § 26-1 (5th ed. 2002). "But a true letter of credit arrangement is not a guaranty." *Id.* at § 26-2. First and foremost, the issuer's obligation to pay upon presentation of conforming documents is a primary obligation, not a secondary one. Although default may trigger a draw, it is only upon proper certification of the applicant's default that the issuer is obligated to pay. *See Ronald A. & Caroline Olson, Inc. v. U.S. Nat'l Bank*, 689 P.2d 1021, 1022 (Or. Ct. App. 1984) ("[I]ssuer's liability on a letter of credit is controlled solely by the terms of that letter.") (citation and internal quotation marks omitted).

**[4]** Furthermore, the independence principle controls the relationship between the issuer and beneficiary. Under this principle, the issuer must pay upon proper certification—with limited exceptions for fraud—even if the beneficiary has breached the underlying contract with the applicant. *Id.* ("A beneficiary's non-compliance with the underlying contract does not affect the issuer's liability unless a reference to the underlying contract explicitly creates a condition for honoring a draft.") (citation and internal quotation marks omitted). Given these distinct features of the letter of credit, it is widely recognized that the issuer is not a guarantor. *See In re Hamada*, 291 F.3d 645, 650-51 (9th Cir. 2002) (collecting cases).

**[5]** Here, however, it is not the issuer that is claiming surety status. It is the applicant—Collateral II. Oregon courts look to the Restatement (Third) of Suretyship & Guaranty as authoritative on suretyship law. *See N. Marion Sch. Dist. #15 v. Acstar Ins. Co.*, 169 P.3d 1224, 1229 n.12 (Or. 2007) (applying Rest. (Third) Sur. & Guar. § 73); *Marc Nelson Oil Prods., Inc. v. Grim Logging Co., Inc.*, 110 P.3d 120, 124 n.5 (Or. Ct. App. 2005) (noting Rest. (Third) Sur. & Guar. superseded Restatement Security). The Restatement states:

> (1) [A] secondary obligor has suretyship status whenever:
>
>> (a) pursuant to contract (the "secondary obligation"), an obligee has recourse against a person (the "secondary obligor") or that person's property with respect to the obligation (the "underlying obligation") of another person (the "principal obligor") to that obligee; and
>>
>> (b) to the extent that the underlying obligation or the secondary obligation is per-

formed the obligee is not entitled to performance of the other obligation; and

(c) as between the principal obligor and the secondary obligor, it is the principal obligor who ought to perform the underlying obligation or bear the cost of performance.

(2) An obligee has recourse against a secondary obligor . . . whenever:

. . .

(b) pursuant to the secondary obligation, either:

(I) the secondary obligor has a duty to effect, in whole or in part, the performance that is the subject of the underlying obligation; or

(ii) the obligee has recourse against the secondary obligor or its property in the event of the failure of the principal obligor to perform the underlying obligation[.]

Rest. (Third) Sur. & Guar. § 1.

The district court concluded that "it [was] clear as a matter of law that [Collateral II] has the status of surety . . . by not later than the date the parties executed Modification 1 to the Contract." The court went on to note that "[Collateral II] was at all material times a secondary obligor [and] . . . [a]rguably, [Collateral II] became a surety at the time KeyBank issued the Letter of Credit . . . ." The district court erred for three reasons.

**[6]** First, the district court erred when it stated that Collateral II "arguably became a surety" when KeyBank issued the Letter of Credit. As we outlined above and as the district court correctly noted, the law on letters of credit is clear that simply entering into a letter of credit transaction does not a suretyship make. The hallmark of the surety is a secondary obligation. When we examine the three relationships in a letter of credit transaction there is typically no secondary liability. Instead, the applicant and beneficiary owe each other primary obligations on the underlying contract, the issuer is primarily obligated to honor the beneficiary's proper draw request, and the applicant is primarily obligated to reimburse the issuer for any payments made to the beneficiary. Under normal circumstances, and as contemplated by the Railcar Contract, Colorado Railcar would be the applicant and TriMet the beneficiary. Despite the fact that this transaction does not mirror normal circumstances, Collateral II's status as the applicant (on behalf of Colorado Railcar) on the Letter of Credit does not make it a surety because it has undertaken no secondary obligation in connection with the transaction. Agreeing to purchase the Letter of Credit for Colorado Railcar only resulted in a primary liability to Colorado Railcar, just as purchasing the Letter only made Collateral II primarily liable for reimbursing KeyBank if it honored a draw on the Letter.

Second, the court erred in cursorily relying upon *Ochoco Lumber* without adequately evaluating the substance of the relationship there between the parties. In *Ochoco Lumber*, Fibrex entered a loan contract with West One Bank under which it was required to provide a letter of credit for the benefit of West One Bank as security. 994 P.2d at 794. Fibrex then entered a sales contract with Ochoco Lumber. As part of their agreement, Ochoco Lumber purchased the necessary letter of credit for the benefit of West One Bank. *Id.* West One Bank subsequently drew on the letter of credit in partial satisfaction of the debt Fibrex owed it, and Ochoco Lumber was required to reimburse the issuer, First Interstate Bank. *Id.* Ochoco

Lumber then sought to subrogate to West One's rights against Fibrex in an attempt to be made whole. *Id.*

The issue was whether the applicant could be subrogated to the beneficiary's rights against the common third-party-debtor. The Oregon Court of Appeals adopted what it characterized as the minority position that the *issuer* was a de facto surety because that result was "consistent with the general practice on standby letters of credit—that the issuer's obligation to pay on the letter of credit only arises if there is default." *Id.* at 797. The court went on to note it was also consistent with the general principle that once the issuer honored the draw on the letter of credit, "the issuer (and the applicant if it has reimbursed the issuer) should be able to step into the beneficiary's shoes and assert its rights." *Id.*

While the multiparty transaction is similar to the one present here, nothing in *Ochoco Lumber* dictates a finding that Collateral II was a surety. Holding that issuers and applicants may step into the shoes of beneficiaries in order to assert a right to performance or payment is wholly different from holding that an applicant is a surety to a third-party contract. In *Ochoco Lumber*, Fibrex owed both West One Bank and Ochoco Lumber a debt. Via the letter of credit Ochoco Lumber essentially paid Fibrex's debt to West One Bank; it is therefore only reasonable that it could step into the shoes of West One Bank, the beneficiary, and assert its right to any remaining debt owed to West One Bank in an effort to be made whole. Here, Collateral II advocates the opposite result. It is not asserting subrogated rights against the third party—Colorado Railcar—to be repaid for its reimbursement to Key-Bank after KeyBank honored the draw on the Letter of Credit.[4]

---

[4]We note that pursuant to the Investment Agreement, Colorado Railcar specifically agreed to reimburse Collateral II's investors to the extent the collateral they pledged to secure the Letter of Credit was foreclosed upon. Thus, it seems Collateral II would be well within its rights to seek repayment from Colorado Railcar. The fact that Colorado Railcar closed its

Instead it seeks to completely avoid any payment to the beneficiary, TriMet, by asserting the surety defense of discharge. This difference is fatal to Collateral II's argument that it should be characterized as a surety. Thus, the district court's reliance on *Ochoco Lumber* was misplaced. It should have, and we must, examine the nature of the relationship more closely to determine if a suretyship existed.

In conducting this examination, the district court stated the law correctly; however, it went on to conclude that the letter of credit was simply the instrument used to make Collateral II a surety as Modification No. 1 made Collateral II answerable for Colorado Railcar's default. Contrary to the district court's conclusion, Modification No. 1 does not indisputably create a surety relationship.

**[7]** When we look to the definition of a surety, what is lacking here is recourse. Although Collateral II purchased the Letter of Credit and its investors pledged their property as security, these obligations run strictly to KeyBank. Collateral II owes no duty to TriMet under either the Letter of Credit or Modification No. 1. The only right those instruments give TriMet is the right to draw on the Letter of Credit provided by KeyBank; they do not give TriMet recourse against Collateral II for Colorado Railcar's default on its primary obligations for TriMet's loss in excess of the $3 million stipulated in the Letter of Credit.

**[8]** Being bound to the principal obligation is the defining feature of a surety:

---

doors in December 2008 and liquidated its assets to satisfy debts owed to secured lenders no doubt explains why Collateral II is not looking to it for collection of its unsecured claims. *See Colorado Railcar has Closed*, Denver Bus. J., Dec. 29, 2008, *available at* http://www.bizjournals.com/denver/stories/2008/12/29/daily6.html.

> Although the relation of principal and surety generally springs from some agreement by which one person becomes personally bound for the debt of another, it may likewise grow out of a transaction whereby a person's property becomes security for payment of a debt or the performance of an act by another. . . . Conversely, the parties to an instrument given as collateral security for the payment of a debt due by others are not subject to the law which governs sureties since they are not bound for the principal debt and their engagement is independent of it.

74 Am. Jur. 2d *Suretyship* § 10 (2005).

[9] Modification No. 1 could not have created a surety relationship because it does not bind Collateral II to the primary obligations of Colorado Railcar. If, for example, the Letter of Credit had not been extended, but had expired in November 2007, TriMet would have had no right to pursue Collateral II for the $3 million in the later event of Colorado Railcar's default on the Railcar Contract. Nothing in Modification No. 1 changes this. Collateral II's participation was independent of Colorado Railcar's duties under the Railcar Contract because it had no additional duties to perform or fulfill if Colorado Railcar failed to perform its primary obligation. Simply purchasing a letter of credit for security as part of another's performance contract does not raise the purchaser to the status of surety, entitled to assert attendant defenses.[5]

[10] This modification was entered into for the purpose of allowing "TriMet to draw on the [letter of credit] in the event of default under [the Railcar] contract by [Colorado Railcar]." It specifically limited Collateral II's participation to define the event triggering the right to draw and did not grant any rights

---

[5]To be clear, we do not hold that a party may never be a surety where a letter of credit is used as a security instrument. Here it is clear that the parties never intended, nor structured the transaction to achieve that result.

or impose any additional obligations on Collateral II. Modification No. 1 did nothing more than give effect to the original intent of TriMet and Colorado Railcar by clarifying the terms of default under the Letter of Credit—Collateral II did not undertake any new obligation to which it was not already bound before Modification No. 1 was executed. With or without Modification No. 1, Collateral II was primarily obligated to reimburse KeyBank for any payments made honoring a proper draw on the Letter of Credit.

The fact that, prior to Modification No. 1, the Letter of Credit required TriMet to certify Collateral II's default without reference to Colorado Railcar does not change this result. A disagreement over whether Collateral II could or could not have actually been in default would not have relieved Key-Bank of its duty to pay TriMet because disagreements between the applicant and the beneficiary do not prevent the issuer from honoring a proper draw in the absence of fraud. Or. Rev. Stat. § 75.1030(4) (2009) ("Rights and obligations of an issuer to a beneficiary . . . under a letter of credit are independent of the existence, performance or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the . . . applicant and the beneficiary."), Or. Rev. Stat. §§ 75.1080, 75.1090 (2009). *See also*, *W. Sur. Co. v. Bank of S. Or.*, 257 F.3d 933, 936 (9th Cir. 2001) ("[I]n determining an issuer's liability for refusal to honor a letter of credit, generally the court must look only to the terms of the letter without regard to those in the underlying transaction."). Thus, even without Modification No. 1, upon proper certification of Collateral II's default, KeyBank was obligated to honor the draw—the very hallmark and beauty of letters of credit. *See* Dolan, *supra*, at ¶¶ 1.05, 3.06 (noting the "pay-now-argue-later" nature of standby letters of credit and the relative ease and cheapness of obtaining them).

Undoubtedly, without Modification No. 1 litigation regarding the default term could have—and likely would have—

ensued, given that Collateral II was not a party to the original Railcar Contract. *See* White & Summers, *supra*, at § 26-7 (noting that once the issuer has honored the draw, the independence principle no longer controls and it would be acceptable for the applicant to sue the beneficiary for violations of any underlying agreement). To give effect to the original intent of the parties, and presumably in an attempt to avoid delay and litigation if a draw was necessary, Modification No. 1 simply clarified that—for purposes of certifying Collateral II's default under the terms of the Letter of Credit—Collateral II would be in default should Colorado Railcar fail to meet its obligations. This does not create a secondary obligation to TriMet or to KeyBank. Before and after Modification No. 1, Collateral II was primarily liable on the reimbursement contract and nothing in the language of Modification No. 1 changed that obligation.

**B**

[11] Because the district court incorrectly concluded that Collateral II was a surety, Collateral II was erroneously permitted to assert the defense of discharge. The district court also erred when it concluded that the PMA materially increased the risk Collateral II faced as a surety, thereby discharging Collateral II's duty under Modification No. 1. Without an underlying duty, the district court found that TriMet necessarily violated § 75.1100(1)(b)'s statutory warranty "[t]o the applicant that the drawing does not violate any agreement between the applicant and the beneficiary . . . ."

[12] Because Collateral II was not a surety, Collateral II cannot invoke the defense of discharge to assert a violation of the statutory warranty. Beyond this issue, the parties do not contest the district court's finding that TriMet's draw on the Letter of Credit was proper and, therefore, Collateral II is not entitled to the award of damages.

## III

**[13]** Collateral II cannot be characterized as a surety, and therefore is not entitled to the defense of discharge. TriMet's draw on the Letter of Credit was proper and did not violate the statutory warranty of § 75.1100(1)(b). We reverse the grant of summary judgment for Collateral II on that claim and remand for entry of summary judgment in favor of TriMet. We also reverse and remand the district court's dismissal of all remaining claims and cross-claims, with instructions to dispose of them in accordance with this opinion.

**REVERSED and REMANDED.**