Argued and submitted April 27, 2010, reversed and remanded for judgment declaring property to be held in trust for Presbyterian Church (USA) April 27, petition for review allowed October 6, 2011 (351 Or 216)

**HOPE PRESBYTERIAN CHURCH
OF ROGUE RIVER,**
a domestic nonprofit corporation,
*Plaintiff-Respondent,*

*v.*

**PRESBYTERIAN CHURCH (U.S.A.)**
and Presbytery of the Cascades,
a domestic nonprofit corporation,
*Defendants-Appellants.*

Jackson County Circuit Court
072707E2; A139430

255 P3d 645

Douglas Ethan Lumish, California, argued the cause for appellants. On the opening brief were James A. Wallan, and Hornecker, Cowling, Hassen & Heysell, LLP. With them on the reply brief were Yen P. Nguyen, Douglas Ethan Lumish, and Weil, Gotshal & Manges LLP.

James R. Dole, argued the cause for respondent. With him on the brief was Cauble, Dole, Sorenson & Ransom, LLP.

Before Ortega, Presiding Judge, and Armstrong, Judge, and Landau, Judge pro tempore.

LANDAU, J. pro tempore.

**LANDAU, J. pro tempore**

This is a dispute between a church, the Hope Presbyterian Church of Rogue River (Hope Presbyterian or plaintiff), and the denomination from which it seeks to separate, the Presbyterian Church (USA) (PCUSA) and its regional presbytery, the Presbytery of the Cascades (collectively, defendants). At issue is the ownership of the real and personal property—including a church building and its contents—to which Hope Presbyterian holds legal title. Hope Presbyterian contends that its title to the property is conclusive. Defendants contend that the general church's organizational constitution, the *Book of Order*, declares that local congregations hold property in trust for the PCUSA and that First Amendment principles require civil courts to give effect to such declarations by a hierarchical church. The trial court determined that the First Amendment authorizes civil courts to resolve church disputes by application of neutral, secular principles of law and that, without reference to the *Book of Order*, Hope Presbyterian was entitled to summary judgment on the basis of its title in the disputed property. The court quieted title to the disputed real property in plaintiff and determined, further, that defendants have no beneficial interest in any of plaintiff's property, real or personal.

Defendants appeal, arguing that the trial court erred in failing even to consider the express trust provisions contained in the *Book of Order* and in failing to give effect to those provisions. We agree and therefore reverse and remand for entry of judgment in favor of defendants.

## I. FACTS

### A. *Presbyterian Governance*

What is known as the "Presbyterian" church has its roots in the sixteenth-century Protestant Reformation and, in particular, the theology of the French lawyer John Calvin and the Scottish theologian (and student of Calvin) John Knox. Among the distinctive features of Presbyterianism is its system of church governance, characterized by a hierarchy of representative assemblies—as opposed to church governance by bishops ("episcopalianism") or congregations ("congregationalism"). *See generally* Sydney E. Ahlstrom,

*A Religious History of the American People* 132-33 (1972). Presbyterians were among the earliest settlers in colonial America, founding congregations as early as the 1630s. In the eighteenth century, a group of Presbyterian ministers met in Philadelphia and formed the first colonial "Presbytery," or governing assembly of elders. In the following two centuries, as both the nation and the church grew, disagreements and divisions within the denomination formed over issues of theology, governance, and national politics—including slavery, women's rights, civil rights, and, most recently, gay and lesbian rights. In consequence, the church in America split and reunited in various combinations on a number of occasions.

Currently, the largest Presbyterian denomination is the PCUSA, which was formed in 1983 as the result of the merger of the Presbyterian Church in the United States and the United Presbyterian Church in the United States of America (UPCUSA), which was itself a result of an earlier merger with other divisions within the larger Presbyterian Church.

Governance within the PCUSA is set out in a constitution, consisting of the *Book of Confessions* and the *Book of Order*, which describes the essentially hierarchical nature of the church's organizational structure. As explained in a statement of historic principles of church government and discipline, first adopted in 1797:

> "[T]he several different congregations of believers, taken collectively, constitute one Church of Christ, called emphatically the Church; that a larger part of the Church, or a representation of it, should govern a smaller, or determine matters of controversy which arise therein; that, in like manner, a representation of the whole should govern and determine in regard to every part, and to all the parts united: that is, that a majority shall govern; and consequently that appeals may be carried from lower to higher governing bodies, till they be finally decided by the collected wisdom and united voice of the whole Church. For these principles and this procedure, the example of the apostles and the practice of the primitive Church are considered as authority."

The *Book of Order* explains that the PCUSA is "governed by representative bodies composed of presbyters." "Presbyters" are the individual ministers and elders of the church. The governing bodies, in hierarchical order, are the "General Assembly," the "synod," the "presbytery," and the "session." The "particular churches" are governed by "sessions," consisting of the pastor and elders in active service. Presbyteries are district governing bodies, with membership representing a minimum of 12 churches, which govern the churches and sessions within their geographical districts. Synods govern geographical groups of not fewer than three presbyteries. The General Assembly is the highest governing body in the PCUSA, and it governs the synods. The General Assembly is made up of elected elders and ministers from each presbytery, who are called "commissioners" to the General Assembly. According to the *Book of Order*, each of the governing bodies is "separate and independent," but each also is "subject to review by the next higher governing body."

The *Book of Order* addresses, among many other things, how real and personal property is held within the church hierarchy. Chapter VIII, entitled "THE CHURCH AND ITS PROPERTY," provides:

> "All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)."

The *Book of Order* further provides that, whenever the property of a particular church "ceases to be used by that church as a particular church of the Presbyterian Church (U.S.A.) in accordance with this constitution, such property shall be held, used, applied, transferred, or sold as provided by the presbytery." The property provisions of the PCUSA *Book of Order* are based on nearly identical provisions in the *Book of Order* of the UPCUSA, with which the PCUSA merged in 1983.

## B.  *Hope Presbyterian Church of Rogue River*

"Hope Presbyterian Church of Woodville, Oregon," was first organized on May 26, 1901, with 11 members and two elders elect. At that time, the congregation was received in the Presbytery of Southwest Oregon, which was its next highest governing body until 1974. The Presbytery of Southwest Oregon was within the organization of a predecessor of UPCUSA.

The community of Woodville apparently became absorbed into the town of Rogue River, and documents in the summary judgment record reflect that, by the 1930s, the church congregation became known as "Hope Presbyterian Church of Rogue River." Over the years, the congregation also went by "Hope Presbyterian Church" or, simply, "Hope Presbyterian."

In 1930, plaintiff formally incorporated as "Hope Presbyterian Church of Rogue River." The articles of incorporation state that the corporation's purpose is "to preach the gospel & to inculcate social & spiritual Principles thru preaching & Teaching, also thru social & Recreational Programs." The articles do not specifically require affiliation with UPCUSA or any other Presbyterian denomination.

In the 1950s, the congregation moved to its current location in Rogue River, Oregon. At that time, legal title to the disputed real property was vested in the Trustees of the Presbytery of Southwest Oregon, which held a mortgage. In 1961, the Presbytery of Southwest Oregon transferred title to "The Hope Community Presbyterian Church, Rogue River, Ore," by warranty deed. The conveyance recited:

> "Trustees of the Presbytery of Southwest Oregon * * * hereby grant, bargain, sell and convey [the property] To Have and to Hold the above described and granted premises unto the said grantee, its heirs and assigns forever. And the grantor does covenant that it is lawfully seized in fee simple * * * and that it will and its successors shall warrant and forever defend the above granted premises, and every part and parcel thereof, against the lawful claims and demands of all persons whomsoever."

The deed did not include any reservation or restriction on the use of the property or mention a trust for defendants or its predecessors. It is undisputed that plaintiff holds legal title to the property.

In the 1950s and 1960s, the presbytery lent money to Hope Presbyterian; the loans were represented by promissory notes and secured by the church property, with mortgages and trust deeds, and were repaid in full.

In 1983, as we have noted, the UPCUSA—with which Hope Presbyterian had been affiliated—merged with the Presbyterian Church in the United States to form the PCUSA. The record on summary judgment shows that Hope Presbyterian's minister and a ruling elder of the congregation were present at the meeting of the presbytery approving the reunion and adopting the PCUSA *Book of Order*. As noted, the PCUSA's *Book of Order* describes how property is held, declaring that all property is held in trust for the denomination and that when property "ceases to be used by that church as a particular church of [PCUSA]," it would be disposed of by the presbytery.

Shortly after the approval of the reunion that formed the PCUSA, Hope Presbyterian amended its bylaws to state that "[t]he name of this congregation shall be the Hope Presbyterian Church of Rogue River." Article II of the bylaws provides:

> "This church being a part of the Presbytery of the Cascades, the Synod of the Pacific, and the Presbyterian Church, USA, is governed in all its provisions by the Constitution of the Presbyterian Church, USA."

At the same time, persons acting on behalf of Hope Presbyterian completed and signed a document entitled "Articles of Amendment" to amend the articles of incorporation of the "Hope 'Community' or 'United' Presbyterian Church." The document stated:

> "This corporation is a church congregation of and holds all property as trustee for the Presbyterian Church (USA)."

The document shows that the amendment was approved at a congregational meeting on October 23, 1983, and at a meeting of the church trustees on November 1, 1983. It is signed

by the congregational president and secretary and by a third individual, all of whom, in signing, "declare[d] under penalties of perjury that we have examined the foregoing and to the best of our knowledge and belief, it is true, correct and complete." The articles of amendment, however, were never filed with the Secretary of State.

## C. *The Quiet Title and Declaratory Judgment Action*

In 2007, Hope Presbyterian's congregation voted to disaffiliate from PCUSA. A dispute between Hope Presbyterian and defendants arose concerning the ownership of the church property. Hope Presbyterian then initiated this action to determine the ownership of the real and personal property in its possession.

In its complaint, it identified itself as "Hope Presbyterian Church of Rogue River," an active "Oregon non-profit religious corporation with members which operates a church[.]" Hope Presbyterian further alleged that it maintains a church in Jackson County, Oregon, and "is affiliated with defendants' religious organization." It asserted that it is the sole owner of the property to which it holds title and that no express or implied trust has been created for defendants' benefit.

In its first claim, Hope Presbyterian sought a judgment quieting title in its favor free and clear of any adverse right, claim, or interest by defendants. On its second claim, it sought a declaratory judgment that it is the sole owner of all real and personal property in its possession and control.

Both sides moved for summary judgment. Defendants asserted that, under the First Amendment to the United States Constitution, civil courts are authorized to resolve disputes between churches and their denominations only in limited circumstances. According to defendants, long-standing United States Supreme Court case law—coincidentally, involving the Presbyterian Church—requires civil courts to defer to the determinations of the highest governing body of "hierarchical" churches. In this case, defendants contended, because the PCUSA clearly is such a hierarchical church, this dispute is conclusively resolved by reference to the *Book of Order*, which unambiguously

provides that all property is held in trust for the denomination. In response, Hope Presbyterian argued that the PCUSA is not actually "hierarchical" in nature and so is not subject to the analysis for which defendants contended. In any event, it argued, under more recent case law, the preferred approach is to resolve disputes under "neutral principles" of law, without regard to evidence relating to church doctrine or polity. Under those neutral principles, Hope Presbyterian argued, its title to the property in dispute is conclusive, as there is no evidence that a trust was created in accordance with the requirements of Oregon trust law.

The trial court sided with Hope Presbyterian. The court explained that the case should be resolved on the basis of "neutral secular principles" of law. The court then said:

> "My way of understanding the neutral secular principles doctrine is that this Court must look at legal documents and must disregard purely church documents such as the Constitution of the Presbyterian Church (USA), statements of ecclesiastical doctrine and church polity, and the Book of Order. That means this court's analysis of this civil dispute about ownership of property, in this civil law court, is based entirely upon legal documents such as deeds and any trust documents that have been appropriately executed according to Oregon law."

The trial court did not consider the *Book of Order* or Hope Presbyterian's amended articles of incorporation, both of which declare that the disputed property is held in trust for the PCUSA. Instead, the court based its decision exclusively on any documents of conveyance or title that the parties submitted to the court. Finding no documents of written conveyance to the PCUSA or any other evidence of a trust, the court concluded that Hope Presbyterian's title in the property was conclusive.

## II.  ANALYSIS

### A.  *The Parties' Contentions*

On appeal, defendants contend that the trial court erred in granting summary judgment in favor of Hope Presbyterian and in denying their own motion. Defendants argue first that the Oregon Supreme Court implicitly, if not

explicitly, has adopted the rule that property disputes in hierarchical churches should be resolved by deferring to the decision of the denominational church. That rule, they argue, is necessary to ensure that civil courts do not become entangled in matters of internal church doctrine and policy, in violation of the religious freedom guarantees of the First Amendment. In this case, they contend, the church hierarchy has determined, as is clearly set forth in the *Book of Order*, that individual churches hold property in trust for the national church.

In the alternative, defendants contend that, even under the neutral principles approach, the record on summary judgment shows that, as a matter of law, the property has been held in trust for PCUSA. According to defendants, under Oregon trust law, the existence of a trust is a question of intent, evidenced by, among other things, a declaration by the owner of property that the owner holds the property as trustee only. In this case, PCUSA contends, Hope Presbyterian's own bylaws and articles of incorporation establish that it has held the property in dispute in trust for PCUSA.

Hope Presbyterian responds, as it did in the trial court, that the rule of hierarchical deference is no longer the preferred approach for state courts to resolve property disputes between churches. According to Hope Presbyterian, the United States Supreme Court now prefers a neutral principles approach to minimize potential interference with internal affairs. Under that approach, it contends, church documents—including its own bylaws declaring that it is governed by the provisions of PCUSA's constitution—are, or at least should be, irrelevant. The sole question, it argues, is whether the technical requirements for establishing a trust under purely secular state law have been satisfied. In this case, it contends, those requirements were not satisfied in that, among other things, the required trust documents were never filed with the office of the Secretary of State.

B. *Analysis*

The parties' contentions on appeal thus require us to decide which, if any, approach has been adopted by the Oregon courts when confronted with a dispute over church

property and whether that approach is consistent with First Amendment guarantees of religious freedom. As we explain below, although the Oregon courts have not explicitly adopted a particular approach, the only relevant Oregon Supreme Court decision appears—at least implicitly—to adopt the hierarchical deference approach for which defendants contend. Under that approach, the declaration of the existence of a trust in the *Book of Order* is determinative. However, as we also explain below, even under the neutral principles approach, declarations of the existence of a trust such as those found in the *Book of Order* and in Hope Presbyterian's amended articles of incorporation are not irrelevant. Taking them into account, we conclude that, even under purely secular principles of Oregon trust law, defendants are entitled to prevail.

## 1. *First Amendment Principles*

We begin with the First Amendment principles that form the context for the parties' arguments about the appropriate approach to state court resolution of church property disputes. The First Amendment to the United States Constitution provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" It is made applicable to the states through the Fourteenth Amendment. US Const, Amend XIV.

For many years, the courts have recognized that resolution of property disputes between churches and their denominational authorities by civil courts runs a risk of civil interference with the churches' free exercise of their faiths, as guaranteed by the First Amendment. *Presbyterian Church v. Hull Church*, 393 US 440, 449, 89 S Ct 601, 21 L Ed 2d 658 (1969); *see also Tubra v. Cooke*, 233 Or App 339, 350, 225 P3d 862, *rev den*, 348 Or 621 (2010), *cert den*, ___ US ___, 131 S Ct 1569, 179 L Ed 2d 473 (2011) (discussing same). The seminal case is *Watson v. Jones*, 80 US 679, 20 L Ed 666 (1871). The dispute in that case had its origins in the Civil War and a doctrinal schism in a local church affiliated with the national Presbyterian church on the question of slavery. 80 US at 684. The national church had resolved to support the federal government and the emancipation of slaves within the Confederacy. *Id.* at 690-91. When a part of the

membership of the local church, supported by its presbytery and synod, dissented from the national church's position and sought to join the Presbyterian Church of the Confederate States, a dispute arose concerning ownership of church property.

The General Assembly had declared that the dissenting presbytery and synod were no longer operating under the true doctrine of the general church and permanently excluded them. The local church itself was split, and a majority of its membership sought to remain with the denominational church. The dissenting presbytery and synod asserted that it was the General Assembly that had departed from the true doctrine of the church and sought to terminate the implied trust relationship with the denominational church with respect to the property.

The Court in *Watson* began by declaring that, when asked, civil courts have authority to resolve secular church disputes over ownership of church property:

> "[T]he courts when so called on must perform their functions as in other cases.
>
> "Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints."

80 US at 714.

As for precisely how the court will resolve such disputes, the Court held that a key consideration is the organizational structure of a church. The Court drew a distinction between "congregational" or "independent" churches—in which each congregation exercises authority with little or no oversight from a superior organizational hierarchy—and more hierarchical churches. The former class of churches, the Court said,

> "has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself * * *; and to property held by such a church, either by way of purchase or donation, with no other specific

trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society."

*Id.* at 724-25. "In such cases," the Court explained, "where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations." *Id.* at 725.

In the case of the latter, hierarchical, form of church organization, the Court said, the local church "is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government." *Id.* at 726. In such instances, the Court said, "we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." *Id.* at 726-27. As an example, the court described the Presbyterian system of ecclesiastical government, which includes "in regular succession, the presbytery over the session or local church, the synod over the presbytery, and the General Assembly over all." *Id.* at 727.

The Court acknowledged that such a view departed from what it characterized as the "English rule," under which courts have the obligation to determine for themselves the extent to which the ecclesiastical doctrine favors one party or another in church property disputes. *Id.* at 728. The Court nevertheless insisted that, under the First Amendment, there could be no inquiry into church doctrine:

"In this country, the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned."

*Id.* at 728-29. But the right to organize does not come without obligations:

"All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

*Id.* Thus, based on principles of implied contract, the Court in *Watson* adopted an approach to resolving property disputes in hierarchical churches that has since been described as "hierarchical deference," or "polity." When resolving disputes in hierarchical churches the Court held,

"the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

*Id.* at 727. Under the rule of hierarchical deference, a civil court must first determine the organizational structure of the church and then, if it determines that the church is hierarchical, it must defer to the decision of the highest judicatory body of the hierarchical church. The Court explained:

"Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each

constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."

*Id.* at 729.

The analytical approach adopted in *Watson* remained the exclusive method of resolving church property disputes for over 100 years. In *Presbyterian Church v. Hull Church,* however, the Court first suggested that state courts might adopt other acceptable approaches to resolving such disputes. That case involved a property dispute between two Georgia churches and the Presbyterian Church in the United States, with which they were affiliated. The two local churches had withdrawn from the general church over doctrinal disputes, including views on the war in Vietnam and the ordination of women. The local churches sought a determination that the general church had substantially departed from the tenets of faith that existed at the time of the local church's affiliation and that, as a result, the implied trust through which church property is held for the general church had terminated. In resolving the dispute, the Georgia Supreme Court agreed with the local churches that the "substantial abandonment" standard applied. The court submitted to the jury the question whether the general church organization had substantially abandoned the tenets of faith and practice as they existed at the time of affiliation. 224 Ga 61, 68, 159 SE2d 690 (1968), *rev'd,* 393 US 440, 89 S Ct 601, 21 L Ed 2d 658 (1969). In so doing, the Georgia court permitted a jury examination into tenets of faith of the parent church.

The United States Supreme Court reversed. Citing *Watson,* the Court explained that Georgia's "departure-from-doctrine" approach was wrong because it required the civil court to determine matters "at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion." 393 US at 450. Plainly, the Court reasoned, the First Amendment forbids

civil courts from playing such a role. *Id.* The Court remanded the case, holding that the Georgia court would have to find a way to resolve church property disputes that did not draw state courts into religious controversies. The Court noted that "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Id.* at 449.

On remand, the Georgia Supreme Court abandoned the implied trust theory. *Presbyterian Church v. Eastern Heights Church*, 225 Ga 259, 261, 167 SE2d 658 (1969). The court adopted in its place what it characterized as a "neutral principles of law" approach, as suggested by the Supreme Court. The court examined the deeds to the property, state statutes dealing with trusts, and the denominational constitution, the *Book of Order*, to determine whether there was any basis for a trust in favor of the general church. Finding nothing in any of those documents that would give rise to a trust, the court awarded the property to the local churches, on the basis of formal legal title in the names of the trustees for the local church. The Supreme Court denied review. 396 US 1041, 90 S Ct 680, 24 L Ed 2d 685 (1970).

In *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 US 367, 90 S Ct 499, 24 L Ed 2d 582 (1970), the Court again had before it a dispute within two churches over the ownership of church property after a schism. Neither the documents of title nor the general church constitution addressed the issue of a trust on behalf of the general church; the local charters expressly placed ownership and control of the property in the local congregations. The Maryland Supreme Court awarded the property to the local churches, relying on the language of the deeds conveying the properties and the terms of the charters of the corporations. 249 Md 650, 656, 241 A2d 691 (1968). In a per curiam opinion, the Supreme Court dismissed the appeal, explaining that, because the resolution of the dispute involved no inquiry into religious doctrine, the appeal lacked a substantial federal question. 396 US at 368.

In a concurring opinion, Justice Brennan, the author of the Court's opinion in *Hull*, took the opportunity to emphasize that, under the First Amendment, the civil courts must

decide church property disputes without resolving underlying controversies over religious doctrine. Justice Brennan expressly approved of the Court's approach in *Watson*, under which he said the states may "enforce the property decisions made within * * * a church of hierarchical polity by the highest authority that has ruled on the dispute at issue, unless 'express terms' in the 'instrument by which the property is held' condition the property's use or control in a specified manner." 396 US at 368-69. Justice Brennan cautioned, however, that the *Watson* approach should be used "only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious policy." *Id.* at 370.

Justice Brennan emphasized that, in his view, the hierarchical-deference approach adopted in *Watson* is not the only acceptable method of resolving church property disputes. "[A] State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* at 368 (emphasis in original). Justice Brennan said that another acceptable means for resolving litigation over religious property is to apply neutral principles of law, developed for use in all property disputes. He gave as an example the "formal title" doctrine, under which "civil courts can determine ownership by studying deeds, reverter clauses, and general state corporation laws." *Id.* at 370.

Justice Brennan's view that the hierarchical-deference approach is only one of perhaps several acceptable approaches to the resolution of church property disputes became the view of a majority of the Court in *Jones v. Wolf*, 443 US 595, 99 S Ct 3020, 61 L Ed 2d 775 (1979). *Jones* involved a dispute over the ownership of church property following a schism in a local church affiliated with the Presbyterian Church in the United States, one of PCUSA's predecessors. Writing for a majority of the Court, Justice Blackman reaffirmed the authority of the civil courts to resolve church property disputes:

"There can be little doubt about the general authority of civil courts to resolve this question. The State has an obvious and legitimate interest in the peaceful resolution of

property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively."

*Id.* at 602.

But, the Supreme Court cautioned, " 'the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.' " *Id.* (quoting *Hull*, 393 US at 499). In resolving church property disputes, the Court said, state courts must not do so on the basis of religious doctrine and practice. As a corollary, the Court said, "the [First] Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." *Id.* Subject to that restriction, the Court said that the First Amendment does not otherwise dictate that a state must follow a particular method in resolving church property disputes. A state may adopt "*any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* (quoting *Maryland & Va. Churches*, 396 US at 368 (Brennan, J., concurring)) (emphasis in original).

One such acceptable approach, the Court explained, is the neutral-principles approach that the Georgia Supreme Court had adopted. Indeed, the Court observed, the Georgia court's approach may even be said to have certain advantages. The Court explained that the application of neutral principles allows for a completely secular resolution of a dispute. The courts can examine legal documents of title, state statutes governing the holding of church property, and the secular provisions of church documents, including the terms of the local church charters and the provisions of the constitution of the general church concerning the ownership and control of church property. *Jones*, 443 US at 603. A neutral-principles approach, the Court explained, "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.*

The Court acknowledged that the Georgia court's method is not completely "free from difficulty":

> "[T]he neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust."

*Id.* at 604. The Court concluded, however, that, "[o]n the balance, * * * the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application." The Court held that "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute" and expressed a preference for such an approach. *Id.*

Three members of the Court dissented, arguing that *Watson* should be understood to require deference to denominational authorities in church property disputes and that only that approach ensures that the rights of religious freedom are protected. *Id.* at 610 (Powell, J., dissenting).

The majority responded:

> "Nothing could be further from the truth. The neutral-principles approach cannot be said to 'inhibit' the free exercise of religion any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*"

*Id.* at 606 (emphasis added).

## 2. Decisions of Other State Courts

Since *Jones*, many states have grappled with the dilemma of how to resolve church property disputes without compromising First Amendment protections. As noted, in *Jones*, the Court said that "a state may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." 443 US at 602 (emphasis in original).

The greater number of courts that have considered the question have adopted what they denominate as a neutral-principles approach. *See, e.g.*, *Episcopal Church Cases*, 45 Cal 4th 467, 485, 198 P3d 66, *cert den*, ____ US ____ , 130 S Ct 179, 175 L Ed 2d 41 (2009); *Episcopal Diocese of Rochester v. Harnish*, 11 NY3d 340, 899 NE2d 920 (2008) (holding that the constitution of the general church establishes an express trust in favor of the general church).

A number of states, however, have retained or adopted the approach of hierarchical deference, as approved by the Supreme Court in *Watson*. *See, e.g.*, *Calvary Presbyterian Church v. Presbytery of Lake Huron*, 148 Mich App 105, 384 NW2d 92 (1986); *Tea v. Protestant Episcopal Church in Diocese of Nevada*, 96 Nev 399, 402, 610 P2d 182 (1980); *Organization for Preserving Constitution of Zion Lutheran Church of Auburn v. Mason*, 49 Wash App 441, 743 P2d 848 (1987); *Church of God of Madison v. Noel, et al.*, 173 W Va 589, 318 SE2d 920 (1984).

Of the courts that have adopted a neutral-principles approach, nearly all have addressed the terms of the denominational church's constitution. *See, e.g.*, *Arkansas Presbytery of the Cumberland v. Hudson*, 344 Ark 332, 40 SW3d 301 (2001). Indeed, some courts have deemed the general church's constitutional provision setting forth an express trust to be sufficient in and of itself to create a trust, even if adopted after the conveyance of the disputed property and in the absence of trust language in the deeds or certificates of incorporation. *Episcopal Diocese of Rochester*, 11 NY3d at 351-52 (holding that the constitution of the general church establishes an express trust in favor of the general church).

A few courts have relied exclusively on the state's common or statutory law regarding formal conveyance of title and have given little or no weight to express trusts in church constitutional documents. *See All Saints Parish Waccamaw v. Protestant Episcopal Church in Diocese of South*, 385 SC 428, 685 SE2d 163 (2009) ("It is an axiomatic principle of law that a person or entity must hold title to property in order to declare that it is held in trust for the benefit of another or transfer legal title to one person for the benefit of another."). We are aware of only one court that has concluded that a general church constitutional provision setting forth an express trust but adopted after the conveyance of the disputed property is not relevant to the determination of the parties' intentions to hold property in trust. *See Arkansas Presbytery of the Cumberland*, 344 Ark at 344.

### 3. *Oregon Law*

There is little, if any, law in Oregon directly addressing how to resolve disputes over church property. One case comes close. *Trustees of the Presbytery of Willamette v. Hammer*, 235 Or 564, 385 P2d 1013 (1963), involved a dispute between a presbytery and the trustees of a local church that had dissolved. The Trustees of the Presbytery of the Willamette brought an action to quiet title in the property, asserting that, when the church dissolved, title to the property in the possession of the church passed to the Presbytery. The trial court quieted title to the property in the Presbytery. The defendants, trustees of the dissolved church, asserted on appeal that title had not passed to the Presbytery or, in the alternative, that the property was subject to a trust for the purpose of maintaining the church and contiguous cemetery.

The Oregon Supreme Court affirmed the trial court's decision that, upon dissolution of the local church, title to the property had passed to the Presbytery:

"At the time [the local church dissolved] it was a member of the United Presbyterian Church in the United States of America. * * * [U]nder the constitution of the United Presbyterian Church when a member church is dissolved the property falls under the control of the Presbytery which, in this case, would be the Presbytery of the Willamette. In

the testimony as to the Presbyterian form of church government, it was explained that the presbyteries * * * 'hold ultimate title to all the properties of the churches within that area' (*i.e.*, the area over which the Presbytery has jurisdiction.). The manner in which title to church property is held within the Presbyterian Church organization could have been made more explicit by reference to the Constitution of the United Presbyterian Church in the United States of America but we consider the testimony explaining the manner in which property is held within the church organization sufficient to show a devolution of title from the dissolved [church] to plaintiff Presbytery."

235 Or at 568-69 (footnote omitted).

Two things are notable about the court's opinion. First, although the court did not cite *Watson* or explicitly refer to the concepts of polity or "hierarchical deference" in resolving the dispute before it, it did refer to the governing documents of the general church, including the general church's constitution.

Second, in a related vein, the Oregon Supreme Court, in referring to the constitution of the Presbyterian Church, cited two cases, *Presbytery of Bismark v. Allen*, 74 ND 400, 22 NW2d 625 (1946), and *Presbytery of Huron v. Gordon*, 68 SD 228, 300 NW 33 (1941). Both cases involved disputes between local Presbyterian churches and the higher church body. And, in both cases, the courts explicitly held that, because of the hierarchical nature of the denominational church, the property held by the local church was subject to the interest of the general church.

In *Presbytery of Bismark*, in fact, the North Dakota Supreme Court quoted extensively from *Watson*. In concluding that the withdrawing church could leave the general church but could not take property with it, the court said:

"The local congregation in the use of the church property as well as in ecclesiastical matters is subject to the ultimate power and control of superior ecclesiastical tribunals. It is but a member of a larger organization under a form of government which subordinates the smaller unit to the final judgment of the larger. The church property does not belong to the local congregation nor to the individual members thereof. Nor does it belong to the higher judicatories. It, in

reality, belongs to the Church, which through its tribunals exerts the right of use and control."

74 ND at 413.

In *Presbytery of Huron*, the South Dakota Supreme Court did not cite *Watson*. But it directly addressed the contention of the local congregation that its interest in the church property was constitutionally protected under the Free Exercise Clause of the First Amendment. The court held that, given the unambiguously hierarchical nature of the organization of the Presbyterian Church, the local congregation is bound by the decisions of the denominational authority. 300 NW at 35-36.

That the Oregon Supreme Court resolved *Trustees of the Presbytery of the Willamette* by deferring to the church constitution is perhaps not surprising. As we have noted, until the United States Supreme Court's decision in *Jones v. Wolf* 16 years later, the hierarchical deference approach was the only one acceptable to a majority of that court.

There are no subsequent Oregon Supreme Court decisions suggesting that something other than the hierarchical-deference approach is required to resolve church property disputes in this state. In one case, *Berean Fundamental Church Council, Inc. v. Braun*, 281 Or 661, 576 P2d 361 (1978), the court resolved a church property dispute solely by reference to Oregon trust law. But whether the church organization was hierarchical in nature was not mentioned; indeed, nothing in the opinion mentions any arguments about constitutional issues. In *Berean Fundamental Church Council, Inc.*, a previously independent congregation decided to join the Berean Fundamental Church. Representatives of the church apparently had told the congregation that a condition of joining the church was that it deed its property to the church, but that, in case of any disputes, the property would be returned to the local congregation. The local congregation deeded its property to the church. A dispute later arose between the local congregation and the church, and the congregation demanded its property back. The church refused and initiated an action to require the local congregation to relinquish the disputed property. *Id.* at 663-65. The Oregon Supreme Court held that, under the circumstances of

that case—particularly, the representations of representatives of the church—the local congregation's gratuitous conveyance of its property to the church resulted in a constructive trust in favor of the local congregation. *Id.* at 668-69.

As we have noted, the court did not mention any details about the organizational structure of the Berean Fundamental Church in its resolution of the property dispute. Hope Presbyterian seizes upon that fact in this case and argues that it represents an example of a court departing from the hierarchical-deference approach. But the court in *Berean Fundamental Church Council, Inc.*, did not even mention its earlier decision in *Trustees of the Presbytery of the Willamette* or the United States Supreme Court's decision in *Watson*. In fact, the court did not mention the First Amendment or any arguments about the parties' concerns about religious freedom. The matter apparently was not argued. Under the circumstances, we hesitate to read any significance into the court's decision as to the continuing vitality of the hierarchical-deference approach that is implicit in its decision in *Trustees of the Presbytery of the Willamette*. We are especially disinclined to do so given that, at the time that the court decided *Berean Fundamental Church Council, Inc.*, the hierarchical deference approach remained the law of the land, the United States Supreme Court's first neutral-principals case not having been issued until over a year later.

In another case, *Decker v. Berean Baptist Church*, 51 Or App 191, 624 P2d 1094 (1981), this court addressed an action by former members of the defendant church seeking to gain control of the church building. Among the plaintiffs' claims was the contention that they had been forced to withdraw from the local church because of their disagreement with the local church's teachings, which went against the general church's doctrine. Citing *Presbyterian Church*, this court held that it could not delve into questions of church doctrine. The court concluded, therefore, that it must assume that the plaintiffs had withdrawn from the church voluntarily. The court said that, "[w]hen issues of doctrine are properly removed from this case, plaintiffs are left with a cause of action for invalidation of certain corporate acts as having

been made without compliance with the existing constitution." 51 Or App at 198. The court concluded that, because the plaintiffs had left the church voluntarily, they no longer had a stake in the internal workings of the church corporation and were not in a position to challenge deficiencies in procedure. *Id.* at 198-99. This court's opinion in *Decker*, in other words, was resolved on the basis of justiciability (standing) and did not speak to the issue presented here or even suggest an approach to resolving church property disputes.

We are left, then, with *Trustees of the Presbytery of the Willamette*, in which the Oregon Supreme Court resolved a church property dispute by deferring to the provisions of the national Presbyterian Church constitution, supported by citations of authority to cases expressly invoking the hierarchical-deference approach that the United States Supreme Court required for so long under *Watson*. No subsequent Oregon Supreme Court decision has suggested that a different approach is now required in order for state courts constitutionally to resolve church property disputes. Accordingly, we conclude that, in the resolution of the dispute between Hope Presbyterian and defendants in this case, we must follow the same course. In this or some future case, the Oregon Supreme Court may elect to adopt a different, less deferential approach to resolving church property disputes. But, in the meantime, this court is obligated to follow such precedent as exists on the matter.

■ Turning to the dispute in this case, application of the approach set out in *Trustees of the Presbytery of the Willamette* leads ineluctably to the conclusion that the property has been held in trust for the PCUSA. To begin with, there can be no question but that the PCUSA, to which Hope Presbyterian belonged, is a hierarchical church, for First Amendment purposes, as our recitation of several United States Supreme Court decisions concerning property disputes involving the Presbyterian Church makes clear. Accordingly, we must defer to the highest authority within the denomination, if it has spoken to the resolution of the dispute. In this case, that, too, is clear, as the *Book of Order*, part of the constitution of the PCUSA, plainly states that all local church property is held in trust for the PCUSA. We note that there also is an

express provision of the Hope Presbyterian bylaws that Hope Presbyterian Church is governed by the constitution of PCUSA.

Hope Presbyterian insists that the PCUSA is not "hierarchical" in nature. It notes that the *Book of Order* itself actually does not use the term. Hope Presbyterian acknowledges that prior United States Supreme Court cases refer to various predecessors to the PCUSA as hierarchical, but the local church insists that we should dismiss such references as either unnecessary *dicta* or simply incorrect. According to Hope Presbyterian, the PCUSA is not "hierarchical" in the sense that, say, the Catholic, Episcopalian, or Methodist churches are; rather, the PCUSA is a unique organization characterized by a "representative form of church government."

To begin with, the United States Supreme Court's prior characterization of the Presbyterian Church as "hierarchical" in nature cannot be dismissed as *dictum*. In decisions such as *Watson*, the characterization was necessary to the Court's analysis and its ultimate holding.

■ Aside from that, Hope Presbyterian's contention that it is not actually hierarchical is not persuasive on its merits. According to the United States Supreme Court, for First Amendment purposes, a "hierarchical" church is one

> "where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization."

80 US at 722-23; *see also Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 US 94, 110, 73 S Ct 143, 97 L Ed 2d 120 (1952) ("Hierarchical churches may be defined as those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head.").

■ As we have described it, the PCUSA, with its layers of supervisory authority, clearly qualifies. The fact that the

various layers of church authority consist of groups of representatives does not alter the fact that the church is organized as a tiered structure with each level in the structure having authority over the one below it. As the *Book of Order* declares, "the acts of each [governing body] is subject to review by the next higher governing body."

In that regard, we find persuasive the explanation of the California Court of Appeal in addressing precisely the same argument in *Classis of Cent. Cal. v. Miraloma Cmty. Church*, 177 Cal App 4th 750, 99 Cal Rptr 3d 499 (2009). That case involved a property dispute between a local congregation and the Reformed Church of America (RCA), a Protestant denomination organized according to a "Presbyterian polity" consisting of four governmental units, each of which exercised general superintendence over any below it. The local congregation resisted application of the hierarchical deference approach to the resolution of such disputes, arguing that the Presbyterian organizational structure actually was more "representative" than "hierarchical" in nature. The court rejected the argument:

> "According to appellants, the Presbyterian structure, which the RCA follows, is representative in form, with authority being exercised by laypersons and clergy in a representative capacity. Thus, they argue that the Presbyterian structure lies in between the congregational and the episcopal (hierarchical) structures, and caution that we should not 'reach a result' that is not reflective of the true nature of the RCA. While it is true that in the RCA structure laypersons and clergy exercise authority in a representative capacity at various governance levels within the denomination, the structure nonetheless follows a tiered model of superintendence and appellate supervisory powers, from the local consistory up to the General Synod. It is this tiered structure, with each ascending tier exercising superintendence and appellate supervisory power over the acts, proceedings, judgments and decisions of the lower tier, that brings it within the general category of a hierarchical as opposed to a congregational church organization."

177 Cal App 4th at 762.

In the alternative, Hope Presbyterian argues that, even if the hierarchical deference approach applies, it should

prevail because, although the *Book of Order* plainly provides that church property is held in trust for the PCUSA, that applies only to the *congregation* known as Hope Presbyterian, as opposed to the *corporate entity* known by the same name, which is legally separate and not affiliated with the PCUSA. The argument, however, is directly at odds with how Hope Presbyterian's own complaint characterizes itself. As we have noted, in its complaint, Hope Presbyterian alleges that it is a "non profit religious corporation * * * affiliated with defendant's religious organization." Moreover, the *Book of Order* expressly provides that a local congregation holds property in trust for the PCUSA "whether legal title is lodged in a corporation" or some other entity.

■  Even assuming, for the sake of argument, that the Oregon courts were bound to apply a neutral-principles approach to the resolution of church property disputes, the result would not be different in this case. As the United States Supreme Court stated in *Jones*:

> "Under the neutral-principles approach, the outcome of a church property dispute its not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*"

443 US at 606 (emphasis added). In this case, the PCUSA did precisely what the Court stated a church could do, namely, modify its charter, the *Book of Order*, to recite an express trust in favor of the PCUSA.

Hope Presbyterian insists that the express trust provision of the *Book of Order* is insufficient for several reasons. First, it contends that any reference to an ecclesiastical document like the *Book of Order* is inappropriate under the neutral-principles approach. That, however, simply is incorrect. The United States Supreme Court itself stated that

it is permissible to refer to such documents, even under the neutral-principles approach, as the foregoing quotation from *Jones* makes clear. Likewise, as we have noted, nearly all (all but one) state courts that have adopted a neutral-principles approach to the resolution of church property disputes do not exclude consideration of denominational charters or articles of incorporation that pertain to the disposition of church property. We see no reason to take a different approach.

Second, Hope Presbyterian argues that, in any event, the United States Supreme Court stated in *Jones* that a denominational declaration of the existence of a trust is effective only if it is "embodied in some legally cognizable form." According to Hope Presbyterian, in this case, the declaration of the existence of a trust in the *Book of Order* was never embodied in a legally cognizable form. It reasons that, under Oregon law, a trust may be created only by written conveyance, and no such written conveyance is in evidence in this case.

■    Hope Presbyterian is correct that, under Oregon law, an express trust generally comes into existence through writings, subscribed by the settlor or its lawful agent and executed with the formalities required by law. ORS 93.020; *see Shipe v. Hillman*, 206 Or 556, 292 P2d 123 (1955); *Connall and Felton*, 225 Or App 266, 270, 201 P3d 219 (2009) ("An express trust in real property can be created only in writing subscribed to by the party creating the trust and executed with formalities required by law."). That is not, however, the only manner in which a trust may be lawfully created. Under ORS 130.150(1)(b), a trust to titled property may be created "[b]y declaration by the owner of property that the owner holds identifiable property as trustee." As this court stated in *Samuel v. King*, 186 Or App 684, 692, 64 P3d 1206, *rev den*, 335 Or 443 (2003), when an " 'owner declares himself trustee of property, a trust may be created without a transfer of title to the property.' " (Quoting *Winters et al v. Winters et al*, 165 Or 659, 667, 109 P2d 857 (1941) (quoting *Restatement of the Law, Trusts* § 17 (1935) ("A trust may be created by * * * a declaration by the owner of property that he holds it as trustee for another person[.]")).)

In this case, as we have noted, in 1983, after PCUSA amended the *Book of Order* to declare that local churches hold property in trust for the PCUSA, Hope Presbyterian amended its own bylaws by expressly including a provision stating that it is bound by the provisions of the constitution of the PCUSA. Simultaneously, the congregation and its leadership approved the amendment to Hope Presbyterian's corporate documents, declaring: "This corporation is a church congregation of and holds all property as trustee" for the PCUSA. Although the amended articles were never filed with the Secretary of State, they express the intention of the congregation and its leadership that all property held by the church is held in trust for PCUSA.

We therefore conclude that, under either the hierarchical-deference or the neutral-principles approach to the resolution of church property disputes, the record in this case is clear that Hope Presbyterian held its property in trust for the PCUSA. The trial court therefore erred in denying defendants' summary judgment and in granting Hope Presbyterian's motion.

Reversed and remanded for judgment declaring property to be held in trust for Presbyterian Church (USA).